## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| N.S.,<br><br>                    Plaintiff,<br><br>        v.<br><br>STEVAN HARNAD, *et al.*,<br><br>                    Defendants. | Civ. No. 21-19820 (RK)(JBD)<br><br>REPORT AND RECOMMENDATION |

     This Report and Recommendation is issued pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72(b)(1), and Local Civil Rule 72.1(a)(2). Plaintiff N.S. moves for leave to file a second amended complaint after the Court dismissed her claims against defendant Trustees of Princeton University d/b/a Princeton University. [Dkt. 52.] For the reasons set forth below, the undersigned recommends that the motion be denied because N.S.'s proposed amendments do not cure the deficiencies that the Court identified in N.S.'s first amended complaint, and because the proposed second amended complaint would not survive a renewed motion to dismiss. The undersigned also recommends that the case against Princeton now be closed with prejudice.

## I.    BACKGROUND

N.S. filed her initial complaint on October 26, 2021 in the Superior Court of New Jersey, Mercer County, against defendants Stevan Harnad, Princeton,[1] and multiple John Does, Jane Does, and ABC entities.  *See* [Dkt. 1], Ex. B.  N.S. filed a corrected complaint on November 2, 2021.  [Dkt. 1] at 1 ¶¶ 1, 7.

In the corrected complaint, N.S. alleged that from 1970 to 1972, as a minor and resident of Princeton, New Jersey, Harnad groomed her on Princeton's campus and then sexually assaulted her off campus.  *Id.* at 8-9.  N.S. alleged that Harnad was a Princeton student and also was employed there as a "teacher, teaching assistant, and/or research assistant."  *Id.*  N.S. alleged seven counts against defendants.  *Id.* at 8-19.  Princeton removed the action to this Court on November 8, 2021 and then moved to dismiss the complaint on January 6, 2022.  [Dkts. 1, 9.] Harnad filed an answer to the complaint, along with cross-claims against Princeton, on May 10, 2022.  [Dkt. 21.]

On February 17, 2023, the Court granted Princeton's motion to dismiss in a memorandum opinion filed in a "nearly identical case" brought by N.S.'s sibling. *See M.C. v. Harnad*, *et al.*, Civ. No. 21-19819, at [Dkt. 22].  The Court dismissed M.C.'s claims (and thereby N.S.'s claims) as to Princeton only on the grounds that M.C. (and thereby N.S.) failed to meet the pleading standard under Rule 8(a)(2),

---

[1]    N.S.'s initial complaint improperly named both "Princeton University" and "The Trustees of Princeton University" as defendants, but she later corrected the caption at the Court's direction to name only "The Trustees of Princeton University."  *See* [Dkts. 26, 27].  For sake of clarity the Court will refer to the Trustees herein as "Princeton."

which requires "fair notice" as to the claims and theories behind them.  *Id.* at 5-8.
The Court granted N.S. leave to file an amended complaint to correct the
deficiencies outlined in the *M.C.* opinion.  *Id.* at 8; [Dkt. 25].

N.S. filed her first amended complaint ("FAC") on April 14, 2023 against
Harnad and Princeton, as well as multiple John Does, James Roes, and ABC
entities.  [Dkt. 29.]  This time, N.S. alleged five counts:  (i) crimes of a sexual
nature, sexual abuse, and sexual assault pursuant to the New Jersey Child Victims
Act, N.J.S.A. 2A:14-2b, and the Child Sexual Abuse Act, N.J.S.A. 2A:61B-1, against
Harnad (Count One); (ii) duty of a property owner to protect a licensee/social guest
against foreseeable risks of harm against Princeton (Count Two); (iii) property
owner's/business's/contractor's duty to protect invitees/social guests against
criminal activity, including crimes of a sexual nature, sexual abuse, and/or sexual
assault against Princeton and John Does and ABC entities (Count Three);
(iv) school/university/business's/supervisor's duty to properly supervise and oversee
employees, agents or volunteers against Princeton and James Roes (Count Four);
and (v) intentional and negligent infliction of emotional distress against both
Harnad and Princeton (Count Five).  *Id.* at 10-21.  Princeton moved to dismiss
Counts Two through Five of the FAC, and Harnad joined in the motion.  [Dkt. 34];
*M.C. v. Harnad*, Civ. No. 21-19819, at [Dkt. 40].

In an opinion and order filed on June 28, 2024, the Court concluded that
Counts One and Five survived as to Harnad, but dismissed without prejudice
Counts Two through Five as to Princeton.  [Dkt. 48] at 6, 18-19; [Dkt. 49].  In a text

order issued on August 15, 2024, the Court noted that N.S.'s complaint had been dismissed twice, and that its latest order granted N.S. leave to file an amended complaint, thereby giving her "a final chance to plead a valid claim" against Princeton by August 12, 2024.  [Dkt. 51.]  But "[i]n light of the age of the case and number of previous decisions," the Court directed N.S. first to file a motion for leave to amend pursuant to Rule 15(a)(2).  *Id.*

Accordingly, N.S. filed the present motion for leave to amend on September 12, 2024.  [Dkt. 52.]  In seeking leave to file her proposed second amended complaint ("SAC"), N.S. asserts that her amendments address the deficiencies that the Court identified in its June 28, 2024 opinion.  *Id.* at 2; [Dkts. 52-1, 53, 60].  Specifically, N.S. contends that the proposed SAC differs from the FAC in that it now "alleges gross negligence by Princeton in maintaining Princeton's campus"; "asserts a claim under *respondeat superior*"; and "alleges sufficient facts to support [the conclusion that] Princeton owed [N.S.] a duty since the sexual assault of [N.S.] was reasonably foreseeable."  [Dkt. 52] at 3.  N.S. also asserts that she "has uncovered additional information to support [that Princeton] knew and/or should have known that the campus was unsafe for minor children prior to enacting the Open Campus policy," and that "[a]ll additional amendments were made to further support the claims originally stated in [the FAC]."  *Id.*

Princeton opposes the motion, arguing that the Court should deny leave to amend because the proposed amendment would be futile.  Princeton argues that N.S.'s proposed SAC fails to state a claim for virtually the same reasons as the FAC,

that the proposed SAC does not allege any facts that address the deficiencies identified in the Court's opinion, and that N.S. still does not allege plausible facts to support her claims against it. [Dkt. 54] at 2-3.

## II. LEGAL STANDARDS

### A. Rule 15 Standard

Rule 15 permits a party to amend its pleading "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Where, as here, the plaintiff must seek leave to amend, that leave "shall be freely given, in the absence of circumstances such as undue delay, bad faith or dilatory motive, undue prejudice to the opposing party or futility of amendment." *Simmermon v. Gabbianelli*, 932 F. Supp. 2d 626, 635 (D.N.J. 2013) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). This liberal policy of permitting amendment exists "in light of the 'principle that the purpose of pleading is to facilitate a proper decision on the merits,'" and "if the underlying facts relied upon by a party might be a proper subject of relief, that party should have the opportunity to test its claims on the merits." *Grasso v. Consolidated Rail Corp.*, Civ. No. 12-398 (KM), 2013 WL 3167761, at *7 (D.N.J. June 20, 2013) (quoting *Foman*, 371 U.S. at 182). Consequently, "absent undue or substantial prejudice, an amendment should be allowed under Rule 15 unless denial can be grounded in bad faith or dilatory motive, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed, or futility of amendment." *Id.* (citing *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004)). The decision whether to grant leave to amend under Rule 15 is

"committed to the sound discretion of the district court." *Smith v. Honeywell Intern., Inc.*, Civ. No. 10-3345 (ES), 2014 WL 301031, at *8 (D.N.J. Jan. 27, 2014) (citation omitted).

## B. Futility

Where, as here, a proposed amendment is opposed on futility grounds, the Court applies "the same standard of legal sufficiency as applies under [a] Rule 12(b)(6)" motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). When evaluating whether a complaint is sufficient, the "[c]ourt must accept all factual allegations as true 'as well as the reasonable inferences that can be drawn from them.'" *Nite Glow Indus., Inc. v. Central Garden & Pet Co.*, Civ. No. 12-4047 (KSH), 2013 WL 5530263, at *2 (D.N.J. Oct. 4, 2013) (quoting *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 796 (3d Cir. 2001)). "The [c]ourt must also construe the facts in a light most favorable to the non-moving party." *Id.*

The proposed amended complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556) (cleaned up). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of

entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557) (cleaned up). A pleading also is not sufficient if "it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (cleaned up). Accordingly, a court need not accept legal conclusions as true, so "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Twombly*, 550 U.S. at 555).

Determining whether a plausible claim for relief has been pleaded is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2) (cleaned up). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Rigollet v. Kassoff*, 570 F. Supp. 3d 246, 249 (D.N.J. 2021) (quoting *Vallejo v. United States*, Civ. No. 13-5455 (NLH), 2015 WL 4653212, at *5 (D.N.J. Aug. 6, 2015)).

There must be "enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element[s]." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016) (alteration in original) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008)). "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-69.

7

Finally, "[a]mendment of the complaint is futile if the amendment will not cure the deficiency in the original complaint or if the amended complaint cannot withstand a renewed motion to dismiss." *Jablonski v. Pan American World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988). Accordingly, a court may "deny leave to amend when a party fails to cure deficiencies from prior amendments to pleadings." *Kane v. Experian*, Civ. No. 23-3526 (JDW), 2024 WL 1975463, at *1 (E.D. Pa. May 3, 2024) (citing *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001)).

## III.    DISCUSSION

N.S. asserts a total of six counts in her proposed SAC, four of which she asserts against Princeton: (1) Gross Negligence (Count One); (2) Negligent Hiring, Supervision, and/or Retention (Count Two); (3) *Respondeat Superior* (Count Three); and (4) Negligent Infliction of Emotional Distress (Count Five). [Dkt. 52-1] ¶¶ 101-141, 147-153. Princeton opposes N.S.'s motion for leave to amend on futility grounds on all counts asserted against it.[2] [Dkt. 54] at 11-18. The Court analyzes in turn the sufficiency of each of N.S.'s proposed claims.

### A.    Gross Negligence (Count One)

To sustain an ordinary negligence claim, a plaintiff must establish "(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages." *Doe v. Small*, 654 F. Supp. 3d 376, 395 (D.N.J. 2023) (quoting *Townsend v. Pierre*,

---

[2]    Princeton also argues that the proposed amendments are futile because they are time-barred. Because this Report and Recommendation recommends that the motion to amend be denied on futility grounds and the case against Princeton be closed with prejudice, the undersigned does not address this additional argument.

110 A.3d 52, 61 (N.J. 2015)). For both ordinary negligence and gross negligence, a plaintiff "must plausibly plead that 'the defendant breached a duty of care and that the breach was the actual and proximate cause of damages to the plaintiff.'" *Moretz v. Trustees of Princeton*, Civ. No. 21-19822 (GC), 2023 WL 9017155, at *5 (D.N.J. Dec. 29, 2023) (quoting *K.J. v. J.P.D.*, Civ. No. 20-14177 (JHR), 2023 WL 2387397, at *4 (D.N.J. Mar. 7, 2023)).

Gross negligence consists of the same elements as ordinary negligence, but it differs "in degree." *Small*, 654 F. Supp. 3d at 395 (quoting *Zelnick v. Morristown-Beard Sch.*, 137 A.3d 560, 567 (N.J. Super. Ct. Law. Div. 2015) (quoting *Monaghan v. Holy Trinity Church*, 646 A.2d 1130 (N.J. Super. Ct. App. Div. 1994)). Where ordinary negligence is a failure to exercise ordinary or reasonable care, gross negligence is "the failure to exercise slight care or diligence." *Id.* (quoting *Steinberg v. Sahara Sam's Oasis, LLC*, 142 A.3d 742, 754 (N.J. 2016)). Although there is no definition for "gross negligence," it generally is associated with "egregious conduct . . . and is used to describe 'the upper reaches of negligent conduct.'" *Bass v. House of Prayer Cogic of Orange*, No. A-1284-20, 2021 WL 6132768, at *2 (N.J. Super. Ct. App. Div. Dec. 29, 2021) (quoting *Kain v. Gloucester City*, 436 N.J. Super. 466, 482 (App. Div. 2014)). Accordingly, "to establish a viable claim of gross negligence, a plaintiff must plead 'something more than inattention or mistaken judgment,' but need 'not [plead] willful or wanton misconduct or recklessness.'" *Moretz*, 2023 WL 9017155, at *5 (quoting *Steinberg*, 142 A.3d at 754) (cleaned up). "In other words, a gross negligence claim can be maintained if a plaintiff shows that

a defendant has exhibited 'an indifference to another by failing to exercise even scant care or by thoughtless disregard of the consequences that may follow from an act or omission.'" *Id.* (quoting *Steinberg*, 142 A.3d at 754).

For either ordinary or gross negligence, however, a plaintiff first must establish that a defendant owed a duty of care in the first place, and identify what, if any, that duty is. *See Cook v. Kelmar Const. Co.*, No. A-3540-12, 2014 WL 3749187, at *3 (N.J. Sup. Ct. App. Div. July 23, 2014) (explaining that to prove a negligence claim, a plaintiff must first establish that a defendant owed the plaintiff a duty of care, since "[t]here can be no actionable negligence if defendant did not violate any duty to the injured plaintiff," and that "[i]t is [the plaintiff]'s obligation to identify the duty he claims was breached") (quoting *Lombardo v. Hoag*, 634 A.2d 550, 556 (N.J. Super. Ct. App. Div. 1993)).

In New Jersey, "[w]hether a duty of care exists is a question of law that must be decided by the court." *Sander v. HR Trust Servs.*, Civ. No. 08-1383 (GEB), 2009 WL 3055368, at *2 (D.N.J. Sept. 21, 2009) (alteration in original) (quoting *Jerkins ex rel. Jerkins v. Anderson*, 922 A.2d 1279 (N.J. 2007)).  In determining whether a duty of care exists under New Jersey law, courts first analyze the foreseeability of the harm and then, if foreseeability is established, determine whether "fairness and policy consideration[s] support the imposition of a duty." *Shelley v. Linden High School*, Civ. No. 19-20907, 2022 WL 1284732, at *4 (D.N.J. Apr. 29, 2022) (quoting *Coleman v. Martinez*, 254 A.3d 632, 642 (N.J. 2021)).

The foreseeability of a risk of harm is "significant in the assessment of a duty of care to another," as it is the "foundational element in the determination of whether a duty exists." *Vizzoni v. B.M.D.*, 212 A.3d 962, 970 (N.J. Sup. Ct. App. Div. 2019) (first citing *J.S. v. R.T.H.*, 714 A.2d 924 (N.J. 1998), then citing *Olivo v. Owens-Ill., Inc.*, 895 A.2d 1143 (N.J. 2006)).  "In the duty of care analysis, foreseeability 'is based on the defendant's knowledge of the risk of injury and is susceptible to objective analysis.'" *Id.* (quoting *J.S.*, 714 A.2d at 924).

The defendant's knowledge of the risk of injury may be from actual awareness, or it may be constructive if the defendant "was in a position to foresee and discover the risk of harm[.]" *Id.* (quoting *Carvalho v. Toll Bros. and Developers*, 675 A.2d 209, 215 (N.J. 1996) (alteration in original)).  "[W]hen the risk of harm is that posed by third persons, a plaintiff may be required to prove that defendant was in a position to know or have reason to know, from past experience, that there [was] a likelihood of conduct on the part of [a] third person[ ] that was likely to endanger the safety of another." *K.J. v. J.P.D.*, 659 F. Supp. 3d 471, 479 (D.N.J. 2023) (alteration in original) (quoting *J.S.*, 714 A.2d at 928).

In the school context, "New Jersey courts have recognized that sexual abuse of minors, inside and outside of schools, 'is often secretive, clandestine, and furtive.'" *Small*, 654 F. Supp. 3d at 396 (quoting *J.S.*, 714 A.2d at 928; *Child M. v. Fennes*, No. A-0873-15T2, 2016 WL 4473253, at *5 (N.J. Super. Ct. App. Div. Aug. 25, 2016)).  "For th[at] reason, courts apply a 'particularized' foreseeability standard, whereby a duty 'to take reasonable steps to prevent or warn of' abuse is limited to

cases where 'the defendant had particular knowledge or special reason to know that a particular plaintiff or identifiable class of plaintiffs would suffer' sexual abuse." *Id.* (quoting *Child M.*, 2016 WL 4473253, at *5) (describing foreseeability standard in this context as "heightened").

If a court concludes that a risk of harm was foreseeable, it then "weigh[s] four additional factors, including the relationship of the parties, the nature of the risk, a defendant's opportunity and ability to exercise reasonable care, and public policy considerations." *Shelley*, 2022 WL 1284732, at *4 (citing *Coleman*, 254 A.3d at 642-43). In evaluating these factors, "courts analyze whether imposing such a duty of reasonable care 'satisfies an abiding sense of basic fairness under all circumstances in light of public policy considerations.'" *Id.* (quoting *Estate of Desir ex rel. Estiverne v. Vertus*, 69 A.3d 1247, 1258 (N.J. 2013)); *see also Vizzoni*, 212 A.3d at 971 (quoting *Carvalho*, 675 A.2d at 213) (quoting *Kelly v. Gwinnell*, 476 A.2d 1219, 1222 (N.J. 1984)) (stating that although a duty of care can arise simply from the determination of the foreseeability of harm, usually "more is needed" to find such a duty, that "'more' being the value judgment, based on an analysis of public policy, that the actor owed the injured party a duty of reasonable care").

In its June 28, 2024 opinion, the Court explained that N.S.'s premises liability claims, which required pleading that Princeton was grossly negligent, "hinge[d] on whether it was reasonably foreseeable that Harnad was sexually assaulting [N.S.] and that the [University] failed to exercise even 'slight care or diligence' in the investigation, detection or prevention of Harnad's sexual

12

molestation of [N.S.]." [Dkt. 48] at 9-10 (quoting *Small*, 654 F. Supp. 3d at 396 (quoting *Steinberg*, 142 A.3d at 745)). The Court concluded that N.S.'s factual assertions in the FAC were insufficient. It noted that "the allegations of 'grooming' occurred on [Princeton]'s campus while all of the allegations of sexual abuse occurred off-campus at Harnad's private apartment or, on one occasion, at [N.S.]'s home." *Id.* at 2.

Princeton argues that N.S.'s proposed SAC continues to fail "to allege anything more than purported inattention or mistaken judgment," and not gross negligence. [Dkt. 54] at 12. Princeton asserts that N.S. makes only conclusory allegations that Princeton knew or should have known of past and present sexual misconduct by Harnad, and still does not allege plausible facts indicating how or why Princeton knew or should have known of sexual abuse committed by Harnad. *Id.*

N.S., on the other hand, argues that the SAC addresses specific issues that the Court identified in its opinion and alleges sufficient facts to support the conclusion that Princeton owed N.S. a duty of care. Specifically, she argues that the proposed SAC now alleges that (i) Harnad's intentional conduct was reasonably foreseeable to Princeton because his grooming behaviors occurred "in plain sight," and that (ii) Princeton knew that the campus was unsafe for minor children before enacting its Open Campus policy. [Dkt. 55] at 1, 6.

1.     **The Risk of Harm to N.S. Was Not Foreseeable to Princeton Based on Acts Alleged to Have Occurred in Plain Sight.**

In her FAC, N.S. alleged that the risk of harm to her was foreseeable to Princeton because it had constructive knowledge of Harnad's sexual abuse inasmuch as campus "proctors" asked N.S. if Harnad was her boyfriend.  [Dkt. 29] at 6.  In its opinion, the Court noted that N.S. did not specify how or whether N.S. responded to those claimed inquiries, such as whether N.S. indicated that she and Harnad were in a romantic/sexual relationship, whether N.S. indicated they were platonic friends, or whether she told them that Harnad was an older brother, cousin, or family member.  [Dkt. 48] at 10.  The Court also noted that N.S. did not allege anywhere in the FAC that she or anyone else reported Harnad to anyone at Princeton for his sexually deviant behavior at any time until N.S. commenced this lawsuit in October 2021.  *Id.*  This, without more, did "not permit the Court to draw any inference—for or against—regarding [N.S.]'s claims."  *Id.* at 11.  The Court also noted that the FAC did not claim that the proctors knew of N.S.'s age, or that any of the proctors actually witnessed Harnad's grooming, pointing out that many of N.S.'s allegations of grooming (hypnotizing N.S., having her sit on his lap, giving N.S. marijuana), took place out of public view in Harnad's classroom or office, while the behavior in plain sight was Harnad talking to N.S., eating lunch with her, and picking her up in his car.  *Id.*

The Court concluded that because the actions that the proctors observed in plain sight were not overtly sexual in nature, "[t]he [FAC]'s allegations of grooming that occurred in plain sight and the Proctors' questioning, without more, fail to

show that the Proctors had constructive or actual knowledge that Harnad was sexually abusing [N.S.]." *Id.*

In its opposition to the present motion, Princeton argues that the sole factual allegation in the proposed SAC that pertains to Princeton's purported knowledge is the same as N.S. alleged in the FAC—that proctors witnessed red flags and grooming by Harnad and "questioned [N.S.] . . . on many occasions if [Harnad] was her so-called 'boyfriend.'" [Dkt. 54] at 12 (citing [Dkt. 52-1] ¶ 82). Princeton also contends that N.S. "still fails to provide how or whether [N.S.] responded to these claimed inquiries, fails to indicate if [N.S.] conveyed to Princeton that Harnad and she were in a romantic and/or sexual relationship, and fails to provide whether [N.S.] indicated to Princeton that Harnad and she were platonic friends, relatives, or otherwise." *Id.* at 13. Princeton also argues that N.S. still does not allege in the SAC that she or anyone else reported Harnad to anyone at Princeton until this lawsuit was filed in October 2021. *Id.* Princeton further contends that the SAC once again does not claim that the proctors or anyone at Princeton knew N.S.'s or Harnad's age, *id.*, and that N.S. continues to fail to allege any facts that support the allegation that Princeton actually witnessed or actually knew of any sexual misconduct or danger that Harnad posed. *Id.* at 14. Accordingly, Princeton argues, the proposed SAC fails to include sufficient details to warrant the imposition of a duty of care on the university. *Id.*

N.S., on the other hand, argues that grooming is a form of sexual abuse, and that Harnad groomed N.S. on Princeton's premises in plain sight by engaging in,

among other things, "hypnosis games, sexually explicit talk, seduction, holding hands with [N.S.], interlocking fingers, sitting on Harnad's lap, inappropriate physical touching, and sitting close to Harnad" with N.S. on one side and her sister M.C. on the other side with each sister touching one of his legs, as well as Harnad consistently offering illicit drugs and alcohol to N.S. [Dkt. 55] at 6 (citing [Dkt. 52-1] ¶¶ 35, 64). N.S. asserts that the grooming acts alone are sufficient notice that Harnad was victimizing N.S.; she argues that Princeton proctors witnessed Harnad's interactions with N.S. on multiple occasions and then questioned the relationship "due to its overtly improper nature, which prompted concern." *Id.* at 7. N.S. also argues that Princeton should have had at least constructive notice of the criminal acts occurring against the minor N.S. based on these facts alone. *Id.* N.S. contends that she is entitled to discovery to determine the reason that the proctors failed to investigate their concerns properly and whether any policies were in place to detect sexual grooming and/or to protect minor children. *Id.* Ultimately, N.S. argues that Princeton was grossly negligent by failing to investigate further the nature of the inappropriate relationship and acts of grooming that occurred in plain sight for 18 months, resulting in Harnad's sexual assault of her off campus. *Id.* at 8.

A review of the proposed SAC reveals the following new factual allegations as to Harnad's grooming activities that took place "in plain sight": Harnad "consistently offered illicit drugs and alcohol to [N.S.] and minor children while on campus in plain sight of the [p]roctors," [Dkt. 52-1] ¶ 35; Harnad "brazenly walked

16

with [N.S.] and other minor children to the campus classroom in plain sight to engage in sexual harassment/misconduct/grooming," *id.* ¶ 41; Harnad held hands interlocking fingers in plain sight of the proctors, in addition to the original allegation that this was done in plain sight of "university staff," *id.* ¶ 43, [Dkt. 29] at 5; Harnad "would openly and consistently take photos of [N.S.] and other minor children," [Dkt. 52-1] ¶ 44; that there was "sitting on Harnad's lap, inappropriate physical touching, and sitting close to Harnad, with [] N.S. on one side and [her sister] M.C., on the other side, having each sister touch one of his legs," *id.* ¶ 64; and "displaying affection, sitting, talking, walking with a minor child, [] N.S., on campus in plain sight," *id.* ¶ 87. The SAC also newly alleges that Harnad "openly preferred the company of [N.S.] and other minor children over adults while on campus." *Id.* ¶ 47. Like the FAC, the proposed SAC alleges that Harnad's grooming occurred "at various places on the college campus premises," and adds to the list of specific areas in the FAC that the grooming also took place on the "grounds," "corridors," "hallways," and "parking lots" on campus. *Id.* ¶ 25.

On review, and for the same reasons expressed in the Court's June 28, 2024 opinion, the proposed SAC cannot withstand a Rule 12(b)(6) challenge. N.S. still does not assert in the SAC whether and how she, Harnad, or anyone else responded to the proctors' questions about her relationship with Harnad, whether the proctors knew how old N.S. was, whether and how the proctors knew or suspected what N.S.'s relationship with Harnad was, or whether and how they knew how old (or even who) Harnad was. *Cf. G.A.-H v. K.G.G.*, 210 A.3d 907, 917 (N.J. 2019) (noting

17

that it is "often difficult to know someone's age based upon appearance alone").  And N.S. still does not plead with sufficient specificity particular acts of sexual grooming that put a reasonable observer on notice that sexual assault might later follow.

N.S. alleges and argues that many of these grooming acts took place "in plain sight."  Although she describes particular acts of grooming and generally where they occurred on campus, the SAC provides no specifics in respect of what acts of alleged grooming behavior any of the proctors saw or heard, and when.  Instead, she alleges in a general and broadbrush fashion that proctors "were present and openly witnessed the[se] red flags and visible grooming behavior," [Dkt. 52-1] ¶ 82, without alleging which acts, if any, occurred within the proctors' eyesight or earshot, or which acts, if any, the proctors (or any other University faculty or staff) actually saw or heard.  This leaves the Court merely to speculate what the proctors are alleged to have "openly witnessed," what N.S. or Harnad told them about the nature of their relationship, and the suspicions that the proctors reasonably could have drawn from those observations.  This is conclusory and not sufficient to satisfy N.S.'s burden of pleading a "particularized" basis of foreseeability.  *Small*, 654 F. Supp. 3d at 396; *Child M.*, 2016 WL 4473253, at *5; *Moretz*, 2023 WL 9017155, at *6 (permitting gross negligence claims to proceed because the student's allegations against her university contained sufficient facts to raise the claim "above a speculative level").

Consistent with New Jersey law, N.S. herself recognizes that grooming behaviors, although "part of a calculated strategy to gain the child's trust and

manipulate them," "are done 'in plain sight'" and can "seem normal or even caring to outsiders."  [Dkt. 52-1] ¶ 54; *accord J.S.*, 714 A.2d at 929-30 (observing that "conduct involving sexual abuse is often secretive, clandestine, and furtive," and "extremely difficult to detect or anticipate"); *Small*, 654 F. Supp. 3d at 396.  Thus, while the proctors' questions as to whether Harnad was N.S.'s boyfriend are not inconsistent with an assertion that they suspected an inappropriate relationship, the facts alleged are not sufficient to plausibly infer that they did suspect one, or that they should have.  *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief") (cleaned up).

Accordingly, even accepting the new scattershot allegation that the proctors observed some of Harnad's grooming behaviors, the proposed SAC does not establish a plausible inference that Princeton, through the proctors, had "particular knowledge or special reason to know" that preparatory sexual grooming or future sexual assault was afoot.  *Child M.*, 2016 WL 4473253, at *5.  Said differently, even if the Court could infer that the proctors' questions to N.S. as to whether Harnad was her boyfriend did indicate that they saw or heard some of the alleged grooming acts, there are no alleged facts from which the Court can plausibly infer that the proctors knew, or should have known, or should have foreseen, that Harnad was grooming N.S. for the purpose of later sexually assaulting her off campus.  *See J.S.*,

714 A.2d at 929-30 ("conduct involving sexual abuse is often secretive, clandestine, and furtive," and "extremely difficult to detect or anticipate").

For many of the same reasons expressed in the June 28, 2024 opinion, the undersigned concludes that the proctors' alleged failure to investigate further is not enough to raise above a speculative level that they knew or should have known that Harnad then was grooming N.S. or that he intended to sexually assault her off campus. Without more, the proposed SAC does not permit a plausible inference that the risk of harm to N.S. was reasonably foreseeable to the proctors and, by extension, to Princeton. Consequently, the proposed SAC does not establish that Princeton owed a legal duty to take reasonable steps to prevent the harm of which N.S. complains. *See K.J.*, 659 F. Supp. 3d at 479.

Accordingly, the SAC does not cure the deficiencies that the Court identified in the FAC. Nor does it sufficiently plead plausible facts to permit an inference that Princeton had either actual or constructive knowledge that Harnad was either grooming or sexually assaulting N.S. based on the asserted grooming acts that occurred "in plain sight."

### 2. The Risk of Harm to N.S. Was Not Foreseeable to Princeton Based on Incidents of Violent Crime on Princeton's Campus Before and After Its Adoption of the Open Campus Policy.

In her FAC and in her opposition to the motion to dismiss it, N.S. alleged that several incidents of crime on Princeton's campus occurred following its adoption of the "Open Campus" policy—robberies, purse snatchings, and a stabbing. [Dkt. 29] at 3; [Dkt. 29-2]; [Dkt. 48] at 13-14. In its opinion, the Court rejected

N.S.'s argument that these incidents made the occurrence of sexual assault foreseeable, holding that the "unrelated spree of criminal incidences—involving property crimes and other non-sexual violence—on Princeton's campus do not establish the [University's] constructive knowledge of sexual assault, and thus does not make Harnad's criminal acts foreseeable." [Dkt. 48] at 14.

In its opposition to the present motion, Princeton contends that N.S. failed to cure the deficiencies that the Court identified, because N.S.'s proposed SAC fails to add additional facts to support her allegations that Princeton's adoption of an "Open Campus" policy made the sexual assault of N.S. off campus foreseeable. Princeton argues that N.S. merely identifies "several more unrelated, irrelevant allegations of random incidents or crimes." [Dkt. 54] at 14-15. Specifically, Princeton argues that the proposed SAC only alleges that "Princeton knew the campus was not safe to minors because of drug and alcohol use and crimes on campus"; "a student was charged with alcohol sale"; "a 'study' showing some of 150 students used drugs"; "a report of a student using a room to host high school students to use drugs and have sex"; "a report of robberies, criminal activity like purse snatching, a slashing, and drug use on campus"; "a report of a faculty member's wife being raped in 1974[,] and [a] wom[a]n suffering a broken jaw from an assault"; "a report of a student in a dorm being assaulted"; "and a report that conservative students did not believe Princeton to be safe." *Id.* (citing [Dkt. 52-1] ¶¶ 103-110). Princeton argues that "[n]ot one of these purported incidents or allegations of conduct at a large University campus pertain to foreseeability of sexual violence against a minor on

campus, off campus, or by an employee—and none are alleged to have involved Harnad." *Id.* at 15.

Consequently, Princeton argues that N.S. alleges in a conclusory manner that Princeton committed gross negligence by failing to investigate Harnad and by opening up the campus to the public, and that the SAC is "devoid of actual, plausible facts that suggest Princeton acted with grossly inappropriate care towards [N.S.]." Princeton thus contends that the SAC fails to state a claim for gross negligence and that granting N.S. leave to amend this claim would be futile. *Id.*

N.S., on the other hand, argues that her SAC provides sufficient facts to support that Princeton knew criminal activities occurred on its campus and despite such knowledge, extended an invitation to minor children. [Dkt. 55] at 4. She argues that under the totality of the circumstances approach, foreseeability can stem from prior criminal acts, even if none of those criminal acts occurred previously on its premises, *id.* (citing *Clohesy v. Food Circus Supermarkets, Inc.*, 694 A.2d 1017, 1028-1030 (N.J. 1997)), and that foreseeability is based on the defendant's knowledge of the risk of injury, *id.* (citing *Vizzoni*, 212 A.3d at 970). N.S. asserts that her allegations of other crimes on Princeton's campus are sufficient under the totality of the circumstances to support an inference that Princeton owed N.S. a duty since the risk to minor children was foreseeable. *Id.* at 5. N.S. also argues that Princeton committed gross negligence by opening the campus to minor children knowing that it was an unsafe environment, contending

that the Open Campus policy was indifferent to the safety of minor children, and even reckless. *Id.* at 6.

Under the "totality of the circumstances approach, the actual knowledge of criminal acts on the property and constructive notice based on the total circumstances are relevant to foreseeability," and "foreseeability can stem from prior criminal acts that are lesser in degree than the one committed against a plaintiff." *Clohesy,* 694 A.2d at 1028. However, while "prior criminal incidents may be considered as a factor in assessing the totality of the circumstances, the incidents must be numerous and sufficiently frequent to be foreseeable and constitute, at minimum, constructive notice." *Garbacki v. Young*, No. A-0021-22, 2024 WL 139036, at *3 (N.J. Sup. Ct. App. Div. Jan. 12, 2024).

In addition to the earlier allegations referencing a "series of incidents involving robberies, a purse snatching, and a knife-slashing" shortly after Princeton implemented the Open Campus policy, [Dkt. 29-2], the SAC adds eight incidents of crime or accounts of drug and/or alcohol use that were reported in local newspapers:  (1) in January 1967, a student was charged with participating in a ring of student salesmen of illegal liquor on campus; (2) in April 1967, a study interviewed 150 students and concluded that "most of them consumed illicit drugs" and that Princeton was referred to as a "dope ring" due to drugs on campus; (3) in 1969, a student used a university room to hold a "constant open house for high school students to enjoy drugs and sex"; (4) in October 1970, it was reported that "all forms of drugs were used and sold" on Princeton campus; (5) in 1972, a faculty

member's wife was raped in the laundry room of the Magie Apartments; (6) in September 1974, a student was raped in Prospect Garden; (7) in October 1974, another woman was punched by an assailant in her dorm room; and (8) in November 1974, a woman was physically assaulted by a man believed to be previously responsible for other harassment.  [Dkt. 52-1] ¶¶ 104-106, 109, 111-112.

These incidents, N.S. argues, support her assertion that Princeton should have foreseen that permitting her to come onto the campus, via the Open Campus policy, put her at risk of sexual assault by Harnad.  Notably, however, the proposed SAC alleges that Harnad assaulted N.S. between the summer of 1970 through 1972, *id.* ¶¶ 17, 26-28, making one of these newly-identified incidents (the rape of the faculty member's wife) toward the end of the relevant time period, and three of the incidents (the rape of the student and the two assaults of female students) two years after the end of the relevant time period.  That leaves only four remaining factual allegations over the course of four years—between 1967 and 1970— in support of N.S.'s assertion of Princeton's actual knowledge of criminal activity before it instituted the Open Campus policy and before N.S. was assaulted: the 1967 arrest of the student illegally selling liquor; the 1967 study concluding that "most" of the students surveyed consumed drugs; the 1969 dorm room "open house" for high school students to enjoy drugs and sex; and the 1970 article asserting that "all forms of drugs were used and sold" on campus.  *Id.* ¶¶ 104-106, 109.  This is a far cry from the situation in *Clohesy*, on which N.S. relies.

In *Clohesy*, the New Jersey Supreme Court concluded that a supermarket had a duty of care to protect its invitees from foreseeable criminal acts, even the kinds that had not previously occurred on its premises. There, the town police department had recorded around 60 criminal incidents either on or near the supermarket's premises over a two-and-a-half-year period that preceded the victim's kidnapping and murder—30 incidents of shoplifting, 12 thefts either inside or in the parking lot, 4 occurrences of driving while intoxicated, 4 disorderly persons, 4 assaults, 1 criminal mischief, 1 trespassing, and 1 possession of a controlled dangerous substance. 694 A.2d at 1021, 1027. The court believed that the escalation of crime on the supermarket's property had been just as significant as the total number, noting that the "crime rate in the area increased substantially in the two years preceding the abduction and murder." *Id.*

Here, the new incidents of crime that N.S. identifies in the SAC are not sufficient in number, frequency, or degree to support an inference that it was foreseeable to Princeton, based on prior criminal incidents on campus, that N.S. was at risk of being groomed on campus and later sexually assaulted by Harnad off campus. *See Ivins v. Town Tavern*, 762 A.2d 232, 237 (N.J. Super. Ct. App. Div. 2000) (holding that evidence of two actual incidents of violence in a one-and-a-half-year span, one inside the bar over a pool game and one in the parking lot involving an intoxicated person, were not enough to put the tavern on notice of a potential fight that would trigger a duty to take preventative measures); *Jackson-Locklear v. William Patterson University*, Civ. No. 16-5449 (JMV), 2018 WL 1942521, at *4

25

(D.N.J. Apr. 24, 2018) (granting motion to dismiss because the rape of a female at a fraternity house was not reasonably foreseeable where the plaintiff did not allege that the fraternity was aware of prior improper conduct by the assailant or that the assailant gave an indication that he could be dangerous on the night of the assault itself, or that there was a previous pattern of conduct at the fraternity which put the fraternity on notice that females were at risk of being assaulted on their premises).

Accordingly, the SAC does not cure the deficiencies identified in the Court's opinion, nor does it sufficiently plead facts to permit a plausible inference that prior criminal incidents made it foreseeable to Princeton that N.S. was at risk of being groomed and sexually assaulted by Harnad.

### 3. The Relationship of the Parties, the Nature of the Risk, Princeton's Opportunity and Ability to Exercise Reasonable Care, and Public Policy Considerations Weigh Against Imposing a Duty on Princeton Here.

Separate and apart from N.S.'s failure to plead sufficiently that the risk of harm to her was reasonably foreseeable to Princeton, the undersigned also concludes that the additional factors that New Jersey courts consider— the relationship of the parties, the nature of the risk, Princeton's opportunity and ability to exercise reasonable care, and public policy considerations—also weigh against imposing a duty on Princeton here.  There is no question, of course, that the grooming and sexual assault of a minor is abhorrent and reprehensible. And undoubtedly there exists a paramount public policy interest in preventing it.

But that interest does not, in itself, make recognizing a duty on Princeton appropriate in this particular factual scenario.

As set forth above, reasonable foreseeability alone is not sufficient to establish a duty of care.  *See Shelley*, 2022 WL 1284732, at *4 (explaining that if foreseeability is established, the court weighs additional factors, "including the relationship of the parties, the nature of the risk, a defendant's opportunity and ability to exercise reasonable care, and public policy considerations" to determine whether imposing a duty of reasonable care "satisfies an abiding sense of basic fairness under all circumstances in light of public policy considerations") (citations omitted); *Carter Lincoln-Mercury, Inc. v. EMAR Grp., Inc.*, 638 A.2d 1288, 1294 (N.J. 1994) ("Subsumed in the concept of foreseeability are many of the concerns we acknowledge as relevant to the imposition of a duty:  the relationship between the plaintiff and the tortfeasor, the nature of the risk, and the ability and opportunity to exercise care.").  "Courts should balance those factors in a 'principled' fashion, leading to a decision that both resolves the current case and allows the public to anticipate when liability will attach to certain conduct."  *G.A.-H.*, 210 A.3d at 915 (citation omitted).  Balancing those factors here, the undersigned concludes that it would be inappropriate to impose a duty on Princeton.

*First*, it bears repeated emphasis that N.S. alleges that Harnad's actual sexual assault occurred off campus and that she seeks to hold Princeton responsible for that off-campus harm, despite Princeton's practical inability to eliminate, or even mitigate, a risk of off-campus sexual assault.  [Dkt. 52-1] ¶¶ 65-74, 122.

27

Acknowledging and without in any way minimizing the real dangers of grooming and the harms that flow from it, *see id.* ¶¶ 49-64, it is inescapable that Princeton was ill-positioned to ensure N.S.'s safety from harms off campus—even if acts preliminary to those harms occurred on campus. That objective reality weighs against imposing a duty here.

*Second*, accepting N.S.'s allegations of Harnad's on-campus grooming and the harm resulting directly from the grooming itself, the nature of the alleged relationship between N.S. and Princeton—or, more specifically, the lack of one— also counsels against imposing a duty on Princeton to protect against that harm. N.S. does not allege any relationship with Princeton other than that of a member of the general public. She has not cited any cases to support her argument that the proctors or any other Princeton personnel had a duty to look actively for grooming behaviors with respect to visitors to campus, or to supervise or monitor her activities on campus. Nor has she identified any authority to support imposing upon Princeton a general duty to take steps to prevent on- or off-campus harm to individuals unaffiliated with the institution. *Cf. Hall v. Millersville Univ.*, 22 F.4th 397, 407 (3d Cir. 2022) (in Title IX action by parents of a deceased university student alleging on-campus sexual harassment by an unaffiliated third party, explaining that it is "[un]likely that a university would have substantial control over any random third party who wanders onto an open campus and harasses students, nor [is] it likely that a university would have substantial control over all aspects of a campus which is open to the public"). Just as a university is unlikely to

have control over a random third party who wanders onto an open campus and harms students, *id.*, so too is it unlikely that a university will have the ability to monitor, supervise, and protect all unaffiliated third parties who wander onto an open campus and suffer harm.

The only somewhat-similar case that this Court could find in which a court recognized a school duty to protect against on-campus sexual grooming, *V.R. v. Bergen Cnty. Prosecutor's Off.*, is consistent with the Court's discussion above. Civ. No. 23-20605 (EP), 2024 WL 3874052, at *12 (D.N.J. Aug. 19, 2024). There, the court recognized a duty where a *student* alleged that she had been groomed by another student (on and off campus), because it is established law in New Jersey that schools have a duty to supervise students entrusted to their care. *Id.* The court explained that "[s]chool employees are expected to oversee students on school grounds" and that "[s]chool officials have a general duty to exercise reasonable supervisory care for the safety of students entrusted to them." *Id.* (citing *Kibler v. Roxbury Bd. of Educ.*, 919 A.2d 878, 884 (N.J. Sup. Ct. App. Div. 2007); *Jerkins ex rel. Jerkins*, 922 A.2d at 1285). Accordingly, schools may be held accountable "for injuries resulting from failure to discharge that duty," so the court recognized that the student would be free to argue that the school should have discovered and prevented a fellow student's sexual grooming of her at school— but only to the extent that the claim was based on events occurring during school hours and on school grounds. *Id.* The court in *V.R.* dismissed the student's

negligence claim to the extent that it sought recovery for grooming acts that occurred off campus or outside school hours.  *Id.*

While the court recognized a duty in *V.R.*, its analysis tilts against recognizing a duty here:  Princeton did not have a freestanding and general supervisory responsibility for an unaffiliated individual's care.  As just noted, New Jersey law recognizes a duty for schools to supervise closely those whose care is entrusted to them.  *See V.R.,* 2024 WL 3874052, at *12 (noting that "[s]chool employees are expected to oversee students on school grounds"); *W.F. v. Roman Cath. Diocese of Paterson*, Civ. No. 20-7020 (MCA), 2021 WL 2500616, at *4 (D.N.J. June 7, 2021) (noting that "New Jersey courts have recognized a 'heightened duty' to protect children from foreseeable harm in situations where a defendant is tasked with supervision or otherwise ensuring the safety of children in its care") (citation omitted); *L.E. v. Plainfield Pub. Sch. Dist.*, 194 A.3d 105, 111-12 (N.J. Super. Ct. App. Div. 2018) ("We have recognized that teachers must at times be present to oversee students on school playgrounds and in hallways, classrooms, lunchrooms and auditoriums.") (cleaned up).  But N.S. does not allege that she was a Princeton student or that she had any affiliation with the university beyond being a member of the general public who walked onto campus, and so Princeton here was not "tasked with supervision or otherwise ensuring [her] safety."  *W.F.*, 2021 WL 2500616, at *4.  Because N.S. was not in any sense entrusted to Princeton's care, it is untenable to impose a general duty on the university to look for, monitor, and

30

ultimately prevent the grooming and subsequent off-campus sexual assault that she alleges.

For these reasons, in the undersigned's view, it is not consistent with "an abiding sense of basic fairness under all circumstances in light of public policy considerations," *Shelley*, 2022 WL 1284732, at *4-5 (citations omitted), to impose upon Princeton a proactive duty to monitor and protect all comers who walk onto its campus—and to take steps to ensure their safety once they leave. Indeed, as the Third Circuit has observed, a university cannot reasonably be expected to have "substantial control over all aspects of a campus which is open to the public." *Hall*, 22 F.4th at 407. Recognizing a duty in these circumstances could extend liability to owners of other similar places open to the general public—*e.g.*, neighborhood playgrounds, town squares, public parks, train stations, city streets, and municipal sidewalks, *et cetera*—and thereby disable "the public [from] anticipat[ing] when liability will attach" when harm is later visited upon a victim by another person in another location. *G.A.-H.*, 210 A.3d at 915. That would, in the undersigned's view, stretch New Jersey tort liability beyond its proper boundaries.[3]

---

[3]    Importantly, this conclusion is not to suggest that Princeton (or other universities) will never owe a duty of care of any kind to unaffiliated individuals who step foot onto an open campus. In the undersigned's view, it is the confluence of the specific circumstances here—a lack of known or reasonably identifiable on-campus acts preliminary to sexual assault (grooming); combined with a lack of known or reasonably foreseeable off-campus sexual assault; combined with Princeton's inability to monitor and prevent that off-campus sexual assault; combined with those off-campus harms having been inflicted upon a non-student victim—that together make recognizing a duty inappropriate.

*** 

The proposed SAC does not plead sufficient facts to warrant the conclusion that Princeton owed N.S. a duty of care. Accordingly, N.S.'s claim of gross negligence in the proposed SAC is futile and would not withstand a Rule 12(b)(6) motion. The undersigned therefore recommends that the motion to amend be denied as to Count One.

## B.    Negligent Hiring, Supervision, and Retention (Count Two)

Under New Jersey law, "negligent hiring, supervision, and training are not forms of vicarious liability and are based on the direct fault of an employer." *G.A.-H*, 210 A.3d at 916. To be found liable for negligent hiring or retention, the plaintiff must show that (i) the employer "knew or had reason to know of the particular unfitness, incompetence[,] or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons" and (ii) "that, through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury." *Id.* (quoting *DiCosala v. Kay*, 450 A.2d 508 (N.J. 1982)). "Critically, timing is important" in alleging a negligent hiring or retention claim, in that "[t]he employee's incompetence, unfitness, or dangerous attribute must be known to the employer *before* the employee takes the action which causes a plaintiff's injury." *Moretz*, 2023 WL 9017155, at *3 (quoting *Westberry v. State Operated Sch. Dist. of Newark*, Civ. No. 15-07998, 2017 WL 2216395, at *11 n.11 (D.N.J. May 19, 2017) (emphasis in original)).

32

"To be found liable for negligent supervision or training, the plaintiff must satisfy what is essentially the same standard, but framed in terms of supervision or training . . . . That is to say, the plaintiff must prove that (1) an employer knew or had reason to know that the failure to supervise or train an employee in a certain way would create a risk of harm and (2) that risk of harm materialize[d] and cause[d] the plaintiff's damages."  *G.A.-H*, 210 A.3d at 916 (citing *DiCosala*, 450 A.2d at 515).

In its June 28, 2024 opinion, the Court dismissed N.S.'s negligent supervision claim "[o]n similar grounds that [it] dismissed" the premises liabilities claims in the FAC, because N.S. failed to establish that Princeton knew or had reason to know that Harnad was "unfit or dangerous prior to" N.S.'s allegations.  [Dkt. 48] at 16 (quoting *M.H. by D.H. v. C.M.*, Civ. No. 20-1807 (BRM), 2020 WL 6281686, at *10 (D.N.J. Oct. 27, 2020)).

In its opposition to this motion, Princeton argues that N.S.'s proposed SAC "fails to go beyond unsupported conclusions regarding this claim," and that N.S. has "not alleged any plausible basis for the conclusion that Princeton knew of Harnad's purported unfitness, incompetence, or dangerous attributes, or that Princeton failed to train or supervise employees or agents such that a risk of harm was created." [Dkt. 54] at 16.  Princeton contends that N.S. does not support with any facts her conclusory assertions that Harnad's sexual misconduct was reasonably foreseeable, that Princeton knew or should have known about Harnad's past sexual misconduct, or that Harnad was unfit or dangerous before N.S.'s abuse.  *Id.*

33

N.S., on the other hand, argues that she has pled that Harnad was under Princeton's supervision and used Princeton's facilities—both areas open to the public and some that were not—while grooming and sexually abusing her, and that Princeton knew or should have known that its failure to supervise Harnad could, and in fact, did, cause her serious injury.  [Dkt. 55] at 9.  N.S. again relies on her allegation that the proctors "were keenly aware of the visible grooming of a sexual nature as they questioned [N.S.] on many occasions if Harnad was [N.S.]'s so-called 'boyfriend,'" and that "[t]he term 'boyfriend' infers that a couple are intimately involved" and that the proctors would not have asked N.S. if an adult male was her boyfriend unless the nature of the relationship was concerning.  *Id.*  N.S. argues that this means Princeton "had imputed knowledge of the risk posed by Harnad, an employee over whom the [University] ha[d] supervisory control," but that Princeton "failed to properly supervise Harnad and investigate further, causing [N.S.] harm." *Id.*  Based on the same reasoning, N.S. now also asserts in the proposed SAC a theory of negligent hiring in addition to the FAC's original assertion of negligent supervision.  [Dkt. 52-1] ¶¶ 128-137.

For many of the reasons set forth at length in Section III.A., above, the undersigned agrees with Princeton.  N.S.'s allegations in support of Count Two are conclusory, unsupported by specific factual allegations, and/or reassert the same facts that N.S. asserted in support of her gross negligence claim, *i.e.*, that Princeton knew or should have known of the risk that Harnad posed.  Like the FAC, however, the proposed SAC offers no factual allegations that establish a plausible inference

that Princeton knew or had reason to know of the risk that Harnad posed to N.S.,
or that he was "unfit or dangerous prior to" N.S.'s allegations. *See K.G. v. Owl City*,
Civ. No. 17-8118 (JBS), 2018 WL 6705679, at *5 (D.N.J. Dec. 20, 2018) (dismissing a
claim of negligent hiring, retention, and supervision where the complaint alleged no
facts to support that claim, such as that the employee had a history of criminal
activity or inappropriate contact with minors, or that the employee was known
within the community for having a reputation for sexual aggression toward minors
that the defendants knew about before the incident with the plaintiff occurred).

Accordingly, the proposed SAC does not cure the deficiencies identified in the
Court's earlier opinion as to Count Two.  Nor does it sufficiently plead plausible
facts to permit an inference (i) that Princeton knew or had reason to know of
Harnad's particular unfitness, incompetence or dangerous attributes; (ii) that
Princeton could reasonably have foreseen that those characteristics created a risk of
harm to N.S.; or (iii) that Princeton knew or had reason to know that the failure to
supervise or train Harnad in a certain way would create a risk of harm.

Therefore, the proposed SAC does not sufficiently plead a claim for negligent
hiring, retention or supervision.  The undersigned recommends that the motion to
amend be denied with respect to Count Two.

### C.  *Respondeat Superior* (Count Three)

In Count Three of the proposed SAC, N.S. asserts (for the first time) a claim
of *respondeat superior* against Princeton.  [Dkt. 52-1] ¶¶ 138-141.  She alleges that
Harnad was Princeton's agent and held a position that allowed him to interact

freely with minors on campus only steps away from his psychology office, and that Princeton bears responsibility for Harnad's actions, because they occurred while Harnad was an agent of Princeton and on premises belonging to it. *Id.* ¶ 139. The proposed SAC alleges that Harnad's criminal actions were facilitated by his position as Princeton's agent and the authority that it conferred upon him, that Harnad's interactions with N.S. occurred on university premises during times when he was ostensibly fulfilling his role as Princeton's agent, and that Princeton's failure to supervise or control Harnad's conduct further supports *respondeat superior* liability. *Id.* ¶ 140. The proposed SAC alleges that Princeton is therefore "liable for the actions of Harnad . . . in accordance with the principles governing principal/agency relationships, in accordance with the doctrine of *respondeat superior* and/or otherwise in accordance with law." *Id.* ¶ 141.

As an initial matter, the Court observes that "the doctrine of *respondeat superior* does not provide an independent cause of action under New Jersey law." *Rowan v. City of Bayonne*, 474 F. App'x 875, 878, n.3 (3d Cir. 2012) (citing *Carter v. Reynolds*, 815 A.2d 460, 463 (N.J. 2003)); *see also Williams v. Verizon New Jersey, Inc.*, Civ. No. 19-9350 (KM), 2020 WL 1227663, at *11 (D.N.J. Mar. 12, 2020) (dismissing a standalone count of "*respondeat superior*" because "*respondeat superior* is not in itself . . . a 'claim upon which relief may be granted,'" and explaining that it is a "legal doctrine under which a court may impose vicarious liability on the employer of a person who has committed some independent tort") (citing *Carter*, 815 A.2d 460). So Count Three itself fails on this ground alone, but

36

for completeness the Court will construe the assertion of *respondeat superior* liability against Princeton as a component of the other tort claims that N.S. asserts directly against Harnad in the proposed SAC.

"Under the doctrine of *respondeat superior* an employer is liable for the torts of his employees which are committed within the scope of their employment." *Brijall v. Harrah's Atlantic City*, 905 F. Supp. 2d 617, 622 (D.N.J. 2012) (citing *DiCosala*, 450 A.2d at 513). Courts consider the following four factors to determine whether an employee's conduct is within the scope of his employment: "(1) whether the act is of a kind the employee is employed to perform; (2) whether the act occurs substantially within the authorized time limits; (3) whether the act is actuated, at least in part, by a purpose to serve the master; and (4) if force is intentionally used by the servant against another, whether the use of force is not unexpectable by the master." *Brijall*, 905 F. Supp. 2d at 622 (citing *Davis v. Devereux Found.*, 37 A.3d 469, 489-90 (N.J. 2012)). "Generally, intentional torts do not fall within the scope of employment." *Id.* at 622 (citing *Davis*, 37 A.3d at 490).

Princeton argues that, even if it is assumed that Harnad was an employee of some kind, it cannot be liable for any torts or crimes that Harnad committed "beyond the scope of [his] employment." [Dkt. 54] at 17 (quoting *Brijall*, 905 F. Supp. 2d at 622). Princeton argues that "Harnad's off-campus sexual assault of [N.S.] is undoubtedly 'beyond the scope' of any possible employment with the [University]." *Id.* at 18 (quoting *Davis*, 37 A.3d at 490; citing *Moretz*, 2023 WL 9017155, at *7). Princeton argues that N.S. "does not, and cannot, allege that

sexual assault was conceivably within the scope of employment between Harnad and Princeton," and thus fails to state a claim for *respondeat superior*, making the amendment futile. *Id.* The Court agrees.

Where the FAC asserted that Harnad was an "agent" of Princeton "as a student teacher, teaching assistant, graduate assistant, research assistant, and/or student volunteer," [Dkt. 29] at 15, the proposed SAC now adds that Harnad also might have been a "professor, teacher, graduate student, graduate teaching assistant, graduate research assistant, psychology doctoral student, employee and/or agent hired, certified, assigned, retained, supervised, managed, overseen, directed, administrated, and/or otherwise controlled by" Princeton, and that Harnad had "full access to a private office as well as classrooms at the Psychology Department." [Dkt. 52-1] ¶¶ 14, 38. Assuming for sake of discussion that N.S. plausibly alleges that Harnad was employed by Princeton in some capacity, the SAC alleges no facts permitting a plausible inference that interacting with, sexually grooming, and sexually assaulting non-student minors were actions "of a kind [that Harnad was] employed to perform." *Brijall*, 905 F. Supp. 2d at 622. Indeed, there are no factual allegations in the proposed SAC that could support a conclusion that Harnad's grooming and sexual assault of N.S. were actuated by a purpose to serve Princeton's educational objective. *Id.* The SAC alleges that N.S. was a member of the general public, and there are no facts pleaded to indicate that she was on Princeton's campus for any specific purpose or that her interactions with Harnad were connected with any class or other program that Princeton sponsored.

*See Smith v. Harrah's Casino Resort of Atlantic City*, A-0855-12, 2013 WL 6508406, at *5 (N.J. Sup. Ct. App. Div. Dec. 12, 2013) ("Intentional torts . . . are typically not within the scope of employment unless 'the employee's conduct—however aggressive and misguided—originated in his or her effort to fulfill an assigned task'") (quoting *Davis*, 37 A.3d at 490).

For these reasons, the undersigned recommends that the motion to amend be denied with respect to Count Three of the proposed SAC and N.S.'s theory of *respondeat superior* liability more generally.

### D.    Negligent Infliction of Emotional Distress (Count Five)

To establish a claim of negligent infliction of emotional distress, a plaintiff must plead and prove that the "defendant's conduct was negligent and proximately caused plaintiff's injuries."  *Cole v. Laughrey Funeral Home*, 869 A.2d 457, 465 (N.J. Super. Ct. App. Div. 2005) (quoting *Decker v. Princeton Packet, Inc.*, 561 A.2d 1122 (N.J. 1989)).  "In order to do so the plaintiff must prove that the defendant owed a duty of care to the plaintiff, which is analyzed in terms of foreseeability."  *Id.* "This is because 'recovery for negligent infliction of emotional harm requires that it must be reasonably foreseeable that the tortious conduct will cause genuine and substantial emotional distress or mental harm to average persons."  *Id.* (quoting *Decker*, 561 A.2d at 1122).

In its June 28, 2024 opinion, the Court noted that N.S.'s claim for negligent infliction of emotional distress was derivative of "the same argument and facts as [N.S.]'s premises liability claims in [the FAC]—that [Princeton] owed [N.S.] a duty

39

because the Proctors' questioning of [N.S.] meant Harnad's sexual abuse was foreseeable," and that this claim failed as to Princeton for the same reasons that her premises liabilities claims failed. [Dkt. 48] at 17.

Here, Princeton again argues that N.S. "fails to allege facts to support the conclusions in the SAC that Harnad's alleged sexual misconduct was foreseeable to the [university]" and that the claim for negligent infliction of emotional distress fails as to Princeton for the same reasons that N.S.'s gross negligence claim does. [Dkt. 54] at 18. N.S., on the other hand, argues that Princeton knew that unlawful activities occurred on campus but invited unsupervised minors anyway, and that the proctors would not have questioned the nature of the relationship between N.S. and Harnad unless they felt it was inappropriate. [Dkt. 55] at 10.

The proposed SAC adds to this claim allegations that Princeton "knew and/or should have known that inviting minor children to a predominately adult male school where illicit drug use and criminal activities occurred would create a sexually hostile environment," and that but for Princeton's invitation to minors in June 1970, N.S. would not have been sexually targeted, groomed, and subjected to crimes of a sexual nature by Harnad. [Dkt. 52-1] ¶¶ 149-50. The SAC alleges that "[b]y allowing minors to be exposed to drugs, alcohol, and sexual predators, Princeton engaged in conduct that endangered the welfare of children," and that the "University's reckless policies and failure to provide a safe environment facilitated the perpetrator, Harnad's[,] ability to groom, intoxicate, drug, and sexually exploit Plaintiff N.S." *Id.* ¶ 151.

These new allegations are conclusory and the claim for negligent infliction of emotional distress in the proposed SAC fails for the same reasons articulated above and in the Court's earlier opinion. There are no facts alleged to support N.S.'s statement that it was foreseeable that a "predominately adult male school" would "create a sexually hostile environment" or contain "sexual predators" that posed a risk to non-student minors who entered campus. And the other allegations are the same as those N.S. relied on in her gross negligence claim—that illicit drug use and criminal activities made it foreseeable that N.S. would be at risk of Harnad's grooming and off-campus sexual assault. The SAC has added no non-conclusory factual allegations that would be sufficient to alter the Court's earlier analysis dismissing N.S's claim for negligent infliction of emotional distress. That claim remains futile.

Accordingly, the undersigned recommends that the motion to amend be denied as to Count Five.

## IV.    CONCLUSION

For the reasons stated, the undersigned recommends that N.S.'s motion for leave to file a second amended complaint be denied as futile. The undersigned also recommends that the case against Princeton now be closed with prejudice. As the Court presaged in its text order directing N.S. to file a motion to amend, the proposed SAC would be her "final chance to plead a valid claim" against Princeton. [Dkt. 51.] Because N.S. has failed to do so, denial of the motion to amend with prejudice is now warranted and appropriate. *See Valente v. Zucker*, Civ. No.

20-8316 (RMB), 2021 WL 4132287 (D.N.J. Sept. 10, 2021) (denying plaintiff's motion to amend with prejudice because her proposed second amended complaint failed to cure the deficiencies that were set forth in the court's order); *Kane v. Experian*, Civ. No. 23-3526 (JDW), 2024 WL 1975463, at *2 (E.D. Pa. May 3, 2024) (denying plaintiff's motion for leave to amend and dismissing her complaint with prejudice where it was plaintiff's "third try at a viable pleading," and her "second try after getting guidance from [the court] about what she ha[d] to do to state a claim," but she still came up short, determining that to afford plaintiff "yet another opportunity to amend" would be inequitable); *Salaam v. Small*, Civ. No. 21-12191 (CPO), 2022 WL 16552788, at *3 (D.N.J. Oct. 31, 2022) (dismissing plaintiff's complaint with prejudice after plaintiff "was given the opportunity to cure the deficiencies in his [c]omplaint but failed to do so," and stating that "where 'plaintiff had already amended [his] complaint and yet failed to allege sufficient facts, the court may find that "[t]hree bites at the apple is enough") (citations omitted).

Pursuant to Federal Rule of Civil Procedure 72(b)(2) and Local Civil Rule 72.1(c)(2), the parties are advised that they have fourteen days to file and serve objections to this Report and Recommendation.

Date:  February 4, 2025

J. BRENDAN DAY
UNITED STATES MAGISTRATE JUDGE